**John and Mary DOE, Plaintiffs,**

v.

**COUNTY OF CENTRE,
et al., Defendants.**

**No. 4:CV–99–0683.**

United States District Court,
M.D. Pennsylvania.

Aug. 30, 1999.

Carl G. Roberts, Esquire, Matthew M. Gutt, Esquire, Ballard Spahr Andrews & Ingersoll, LLP, Philadelphia, PA, Stefan Presser, Esquire, Scott Burris, Esquire, American Civil Liberties Foundation of Pennsylvania, Philadelphia, PA, Counsel for plaintiffs.

Gerard J. Geiger, Esquire, Newman, Williams, Mishkin, Corveleyn, Wolfe & Fareri, P.C., Stroudsburg, PA, Counsel for defendants.

## *MEMORANDUM*

McCLURE, District Judge.

### *BACKGROUND:*

On April 28, 1999, plaintiffs John and Mary Doe commenced this action against various· defendants [1] with the filing of a complaint pursuant to the Americans with Disabilities Act ·("ADA"), 42 U.S.C. § 12101, *et seq.;* section 504 of the Rehabilitation Act of 1973 ("Rehab Act"), 29 U.S.C. § 794; Title IV of the Civil Rights Act of 1964 ("Title IV"); and 42 U.S.C. § 1983. Plaintiffs allege, *inter alia*, that defendants violated their civil rights by

---

**1.** Named as defendants in this action are Centre County; Centre County Office of Children and Youth Services ("CYS"); Board of Commissioners of Centre County; Terry Watson, individually and in his official capacity as the Director of Centre County CYS; Carol Smith, individually and in her official capacity as the Assistant Director Administrator of the Centre County CYS; and Lisa Rice, individually and in her official capacity as a Foster Home Specialist of the Centre County CYS.

excluding plaintiffs from participation in the foster care program run by Centre County because of the disability of plaintiffs' son and on account of plaintiffs' race. *See* Complaint at ¶ 1.

The crux of this matter and the focus of the preliminary injunction hearing concerns a mandatory disclosure policy ("Policy" or "The Policy") adopted by the Board of Commissioners of Centre County which has the effect of mandating that before a foster child is placed in the Doe home:

> (1) the Does must allow CYS to disclose the fact that AJB has AIDS to the biological parents of any foster child placed in the Does' home; and
>
> (2) the biological parents of the foster child placed in the Doe home must execute a written waiver releasing CYS from any liability arising from the foster child's placement in the Doe home.

Plaintiffs filed concurrently with their complaint a motion for a preliminary injunction seeking that the Policy be declared unlawful and that their home study be completed for placement of foster children into their home.[2] The court on June 22, 1999, held an evidentiary hearing on the motion for a preliminary injunction. The parties then were granted leave to submit supplemental briefs along with findings of fact and conclusions of law.

Before the court is plaintiff's motion for a preliminary injunction. For the reasons which follow, we will deny the motion.

## DISCUSSION:

### I. Standard for Preliminary Injunctive Relief

Fed.R.Civ.P. 65 provides for the issuance of preliminary injunctions. In the Third Circuit,

> [a]t the trial level, the party seeking a preliminary injunction bears the burden of producing evidence sufficient to convince the court that (1) the movant has shown a reasonable probability of success on the merits; (2) the movant will

> be irreparably injured by denial of relief; (3) granting preliminary relief will not result in even greater harm to the other party; and (4) granting preliminary relief will be in the public interest. . . .

*ECRI v. McGraw–Hill, Inc.*, 809 F.2d 223, 226 (3d Cir.1987) (citation omitted).

The requirement of a reasonable probability of success on the merits also has been described as a "better than negligible chance" of success on the merits. *Int'l Kennel Club v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir.1988) (citations omitted). Regarding the element of irreparable injury, the harm must be imminent and of such a nature that money damages alone cannot atone for it. *ECRI*, 809 F.2d at 226.

### II. Findings of Fact

#### The Doe Family

1. Mary Doe is a Caucasian woman. She is a citizen of the United States and of the Commonwealth of Pennsylvania, residing in the Borough of State College, County of Centre, Pennsylvania. Mary Doe is currently 52 years old.

2. John Doe is an African–American male, and is a citizen of the United States and of the Commonwealth of Pennsylvania, residing in the Borough of State College, County of Centre, Pennsylvania. John Doe is currently 50 years old.

3. John Doe had a robbery conviction in the 1970's as well as a burglary conviction in the 1970's.

4. John Doe has spent 14 years in prison, including time spent in the juvenile justice system.

5. John Doe was released from prison in 1984. He has had no convictions since his release.

---

2. At the time of the evidentiary hearing, the Does' home study was not yet completed and was pending final approval.

6. John Doe graduated from The Pennsylvania State University in 1991 with a degree in administration of justice.

7. At present, John Doe is a cab driver who works from 1:00 p.m. to 9:30 p.m., Saturday through Monday.

8. John Doe has in the past worked as an aide for the Pennsylvania Association of Retarded Citizens, as well as a drug and alcohol counselor to prisoners in the State Correctional Institution at Rockview.

9. John and Mary Doe married on December 31, 1996.

10. Prior to marrying John Doe, Mary Doe adopted several children. Two of those children are AJB and MJB.

11. AJB and MJB are biological brothers. Mary Doe has cared for both AJB and MJB since their infancies.

12. AJB and MJB are both African–American males. AJB is currently 10 years old; MJB is 11 years old.

13. After his marriage to Mary Doe, John Doe adopted both MJB and AJB.

14. AJB and MJB live with John and Mary Doe.

15. John and Mary Doe do not have medical insurance.

16. In 1997, John Doe injured his leg and was unable to work. During that time, he received Medical Assistance. The Does no longer receive Medical Assistance.

17. Mary Doe has a web site on America Online devoted to helping other parents of children with AIDS. The members of the Doe family are identified on this web page by their first names. The Does' e-mail address is also displayed on this web page. The e-mail address is comprised of Mary and John Does' first names.

### The Does' Foster Parenting History

18. Before her marriage to John Doe, Mary Doe had extensive experience as a foster parent in the state of New York.

19. During the time that Mary Doe served as a foster parent in New York, she cared for eight children. She eventually adopted seven of those children, two of whom are MJB and AJB.

20. Several of the foster children in Mary Doe's care in New York had special needs or were disabled.

21. Several of the foster children in Mary Doe's care were victims of abuse prior to their placements with Mary Doe.

22. Mary Doe testified that none of the children in her care harmed AJB in any way.

23. Mary Doe was selected as Foster Parent of the Year by the New York State Foster Parents' Association. She was also highlighted as "New Yorker of the Week" on New York City's Cable Channel One.

24. When Mary Doe moved to Pennsylvania to join John Doe, she moved with four of her adopted children.

25. Prior to applying with CYS, the Does had applied and were approved as foster parents with a private foster care agency, Hope For Kids. The Does did not accept a foster child referral from this agency because the child did not meet the background requirements that the Does had deemed appropriate for their family and had communicated to the agency. The Does terminated their relationship with Hope For Kids and are no longer licensed as foster parents with that agency.

### Centre County CYS Foster Care Program

26. Defendant Centre County provides a foster care program for children in need of temporary or permanent placements outside of the homes of their biological or custodial families.

27. Centre County and CYS are beneficiaries of federal funding, and a portion of the federal funding that those entities receive benefits the Centre County Foster Care Program.

28. The Centre County Foster Care Program is administered by the Centre County CYS. CYS is obligated to operate the Centre County Foster Care program in accordance with all applicable federal and Commonwealth regulations.

29. Defendant Terry Watson is the Director of CYS. He has overall management responsibility for CYS' programs, including the Centre County Foster Care Program.

30. Defendant Carol Smith is the Assistant Director of CYS. She assists Watson in overseeing CYS' programs, and she is ultimately responsible for the selection and training of foster families under the Centre County Foster Care Program.

31. Defendant Lisa Rice is a Foster Home Specialist employed by CYS. She is responsible for helping to select and counsel current and potential foster families under the Centre County Foster Care Program.

32. Tom Groninger is an employee of CYS who performs the preliminary home study for potential foster parents.

33. CYS has a continuing and current need for new families to serve as foster families under the Centre County Foster Care Program. CYS has recruited and continues to recruit foster families to care for certain children in the Centre County Foster Care system who are in need of placements outside of their regular homes.

34. The steps in a foster parent application, as testified to by Smith, are as follows:

A. CYS receives an initial phone call from interested potential foster parents;

B. Tom Groninger performs the preliminary homestudy;

C. the potential foster parents undergo six weeks of pre-service training;

D. the potential foster parents meet with Lisa Rice for a final walk-through and assessment;

E. Lisa Rice then meets with Carol Smith to either approve or disapprove the potential foster parents' application.

35. CYS makes its placement decisions based on the best interests of the foster child.

36. In accordance with 42 U.S.C. § 1996b, CYS may not delay or deny the placement of a child for adoption or into foster care, on the basis of the race, color, or national origin of the adoptive or foster parent, or the child, involved.

37. Although the goal of placement is short-term with an eye towards reunification, because of uncertainties regarding the duration of placement, CYS places children into homes in which they can thrive on a long-term basis, if necessary.

*John and Mary Does' Application Status with CYS*

38. John and Mary Doe applied to be foster parents with CYS on or about January, 1998.

39. Tom Groninger conducted a preliminary home study of the Does.

40. Groninger reported to CYS that a child with AIDS resides in the Doe home.

41. Prior to the submission of the Does' application to become foster parents, CYS never knowingly placed an HIV or AIDS-infected child into a foster home.

42. In January, 1998, CYS did not have a policy that addressed what limitations, if any, applied to foster homes in which a child with an infectious disease such as HIV or AIDS resided.

43. At present, the Does have completed the mandatory six-week pre-service training.

44. After CYS adopted its policy in December 1998, the Does refused to continue with the application process.

45. CYS informed the Does by correspondence dated December 18, 1998, that CYS was ready to proceed with the Does' application.

46. At present, the Does need to meet with Lisa Rice for the final walk-through of the home and assessment of their foster parent application.

47. The Does' background checks (including criminal record checks and Childline checks), physicals, and first aid examinations need to be updated, as they expired in January, 1999.

48. CYS has not made a final determination regarding John Doe's criminal history.

49. CYS will consider the Does' financial stability in making its final determination regarding the Does' foster parent application.

### CYS's Policy

50. The Policy provides in pertinent part as follows:

C) **Placement of Children With Serious Infectious Diseases** [CYS] will approve specific foster homes for placement of children with serious infectious diseases and will assure that the caregiver is given the necessary medical and other training needed to meet a child's specific condition. If a child with a serious infectious disease is placed in a foster home, or if there is a family/household member of the foster family who has a serious infectious disease, only children with the same serious infectious disease will be considered for placement in that home. The only exception to this policy would be for a parent/guardian of a child in the care and custody of [CYS] to sign an informed consent for the placement of their non-infected child in such a home. (See attached Placement Consent.) For this exception to occur, the foster parents would have to voluntarily agree to release information to the child's parents that a member of the foster family/household has been diagnosed with a specific serious infectious disease. (See attached Foster Parent Consent to Release Medical Information.)

51. Centre County CYS did a thorough investigation of other infectious disease policies throughout the Commonwealth of Pennsylvania before enacting its own policy.

52. During its investigation CYS discovered that very few counties had a policy which specifically addressed the issue of AIDS in the foster home context.

53. CYS consulted with James Rayback, Esquire, Centre County Solicitor, as well as the solicitors for Lancaster and Delaware Counties, and various other legal resources, in order to formulate a policy regarding the placement of children in a foster home where children with infectious disease were present.

54. In researching and enacting its infectious disease policy, CYS considered its policy under the Adoption and Safe Families Act, 42 U.S.C. § 671, whereby the foster child's health and safety shall be the paramount concern in administering and conducting its foster home program.

55. CYS is mandated to consider the best interests of the foster child before considering the desires of foster parents who wish to care for a child.

56. CYS' policy is to protect the physical and emotional health of the children whom it places into foster homes.

57. In order to promote the psychological welfare of foster children whom it places, CYS tries to place children in homes that are stable, and attempts to minimize the movement of children from foster homes to the extent possible.

58. The Policy was adopted on December 17, 1998 by the Centre County Board of Commissioners.

59. CYS has no authority to disobey the Policy.

60. The Policy does not prohibit the placement of a child into the Does' home but requires that disclosure of the risk be made to the biological parents who must then give their written consent for placement.

### Characteristics of Foster Children Placed by CYS

61. The children that CYS place typically in foster homes are neglected, in poor physical health, and in need of medical care.

62. The children that CYS place typically in foster homes have often been sexually abused and are sometimes sexual perpetrators.

63. The following statistics, as testified to by Carol Smith, reflect the total number of foster children in care with CYS, as well as the break-down of children with problems:

- As of March 31, 1999, CYS had 125 children in placement.
- Of those children:
  - 49% (61 children) had behavioral or emotional problems;
  - 24% (30 children) had been victims of sexual abuse;
  - 5% (6 children) had been perpetrators, only, of sexual abuse; and
  - 7% (9 children) had been both perpetrators and victims of sexual abuse.

64. CYS has had cases whereby sex between children has occurred in a matter of minutes.

65. It is often not possible, given the nature of the placements, to determine whether a child has been the victim of sexual abuse or will be a sexual perpetrator.

66. CYS had one incident whereby a foster child was engaging in inappropriate sexual conduct with another child, upon the momentary absence of the foster mother from the room in which this conduct occurred.

67. CYS has had cases in its foster homes where children have engaged in sexual intercourse, oral sex, fondling and other inappropriate sexual contact.

68. It was CYS' concern for the risk of this conduct occurring that resulted in the policy which CYS adopted.

69. Many of the foster children placed by CYS have behavioral problems and are physically aggressive with other children.

### AJB'S Medical Condition

70. AJB has Acquired Immuno–Deficiency Syndrome ("AIDS"). AJB was diagnosed with AIDS at the age of 10 months. Doctors determined that AJB contracted the Human Immunodeficiency Virus ("HIV"), which causes AIDS, from his biological mother at birth.

71. Due to aggressive drug therapy commencing in 1996, AJB's AIDS viral load has been suppressed to undetectable levels.

72. In December 1998, AJB was hospitalized with pneumonia. The pneumonia was not AIDS-related, and was treated effectively with antibiotics. AJB has fully recovered from his bout of pneumonia.

73. Despite his overall good health, AJB still suffers substantial limitations due to his AIDS. Throughout his life, AJB's AIDS has caused him great difficulty in his eating and digestion. AJB suffers from chronic colitis and diarrhea because of his AIDS. AJB still receives most of his nutrition through a gastrointestinal feeding tube.

74. AJB also suffers from permanent learning deficits resulting from a seizure brought on by his AIDS. AJB verbalizes very little and attends school classes for children with special needs. He exhibits symptoms of autism and mental retardation.

75. AJB's learning deficits have left him unable to care for himself. He is dependent on his parents to provide for all of his daily care, including assisting him with eating, cleaning, and toileting.

76. Prior to beginning new drug therapy in 1996, AJB's health was seriously compromised by his AIDS. His eating and digestive problems were far more severe, and he weighed only 37 pounds at the age of six in March of 1996. His digestive problems made him extremely weak and AJB had extreme difficulty in walking on his own.

77. Prior to 1996, AJB was hospitalized on numerous occasions to treat complications arising from his AIDS. AJB's AIDS at that time was in a terminal phase.

78. When AJB's AIDS was in a terminal phase, AJB's T-cell count was 20. At present it is between 450 and 500.

79. AJB's current physical deficits are not commonly identified by the public as

symptoms of AIDS, and AJB exhibits no external indications to the public that he suffers from AIDS.

80. Due to their fear of potential discrimination and harassment by the community at large, the Does have only revealed AJB's AIDS status to family, friends, and other persons with a need to know that information.

81. Officials at AJB's school are aware of AJB's AIDS status. At no time have school officials attempted to segregate or exclude AJB from school because of his AIDS. To the contrary, school officials work closely with the Does to ensure that AJB could be meaningfully and safely included in the school community.

82. School officials at all times have respected the privacy interests of AJB and the Does with regard to AJB's AIDS. School officials do not require the Does to disclose AJB's AIDS status to the parents of HIV-negative students, nor do they ask those parents to consent to AJB's attendance at public school.

83. AJB has not transmitted HIV to any children with whom he attends school. In fact, AJB has not experienced any incident in school which created a risk of transmission of HIV to other schoolchildren.

84. MJB has maintained a close relationship with AJB notwithstanding his brother's illness. MJB spends a great deal of time playing with and entertaining AJB. MJB has not contracted HIV from AJB.

85. Mary Doe has never seen AJB engaging in rough play or potentially injurious behavior with MJB.

86. Mary and John Doe keep AJB under constant observation while caring for him at home. Mary and John Doe have an electronic monitoring system to monitor the children's actions while not present in the same room.

*Medical Testimony*

87. AJB's current health is quite good.

88. Because AJB's viral load is so low at the present time, AJB suffers no greater risk of opportunistic infection than another child who does not have HIV or AIDS.

89. Due to the success of AJB's drug therapy and his low viral load, AJB can be expected to remain in good health for at least the next six to ten years. Moreover, AJB is likely to remain in good health for much longer because numerous new drug treatments for AIDS are becoming available.

90. It is difficult to predict when AJB's condition will deteriorate.

91. AIDS and HIV are unlikely to be transmitted in a casual contact situation.

92. In cases where sexual contact occurs, there is a high risk of HIV transmission.[3]

93. There are between 20,000 and 21,000 AIDS cases reported in Pennsylvania.

94. Of these 20,000 to 21,000 cases, there are no known cases in which the HIV virus was transmitted by casual contact, such as through the use of a toothbrush or razor.

*Current Medical Understanding of HIV and AIDS*

95. AIDS is the last stage of progression of HIV. HIV/AIDS infects the body by attacking the hemic and lymphatic systems. In other words, HIV infects and destroys those cells in the human body that support the body's immune system. As the virus progresses, infected persons become more susceptible to other opportunistic infections and diseases.

96. Recently developed drug therapies such as the one that is administered to AJB have been extremely effective at slowing the progression of AIDS.

---

**3.** Paragraphs 86 through 91 are based on the uncontradicted testimony of Robert Swenson, M.D., a physician who was accepted as an expert in the treatment of infectious diseases in general and HIV/AIDS in particular.

97. In addition to current drug therapies, the FDA has approved 18 new drugs for treating AIDS which will be available to AIDS patients in the near future.

98. AIDS is a terminal disease for which no cure has been found.

99. The HIV virus is transmitted only through the absorption of infected blood or other infected bodily fluids into the bloodstreams of the non-infected person. For the virus to be absorbed into the bloodstream of a non-infected person, infected fluids must be injected into a person's bloodstream, or must be absorbed through open sores or mucous membranes.

100. The majority of medically-documented cases of HIV transmission stem from sexual contact and sharing of hypodermic needles.

101. HIV cannot be spread through casual contact such as hugging.

102. HIV has been detected in minute amounts in bodily secretions such as tears, sweat and saliva.

103. A sexual perpetrator may be at risk from contracting the HIV virus from an individual with HIV or AIDS.[4]

### Events Leading to the Filing of the Complaint and Motion

104. Mary and John Doe believe that the waiver and disclosure policy of CYS is unlawfully discriminatory.

105. Mary and John Doe believe that the confidentiality of AJB's medical condition is of paramount importance and that CYS' policy interferes with that confidentiality.

106. Counsel for the Does sent a letter to CYS dated September 4, 1998, challenging CYS' actions as disability-based discrimination.

107. By letter dated September 18, 1998, James M. Rayback, Esquire, Solicitor for Centre County, responded to the correspondence on behalf of CYS. Rayback informed counsel for the Does that a final determination on the Does' application had not yet been made and that the Does would be receiving more information from CYS.

108. By letter to the Does dated October 2, 1998, CYS requested a signed release for AJB's medical records from his primary care physician.

109. The Does executed the release requested by CYS.

110. In addition, Michael Ryan, D.O., AJB's primary care physician, wrote a letter to CYS confirming AJB's current health status as "good."

111. By letter to the Does dated December 18, 1998, CYS informed the Does that they were prepared to go forward with the approval process for the Does to serve as foster parents to HIV-positive children.

112. The December 18, 1998 correspondence further informed the Does that if they wished to be approved as foster parents for any other children, the Does would have to agree to the consent and waiver provisions of the Policy.

113. Counsel for the Does sent a letter to CYS dated December 24, 1998, rejecting the conditions imposed by CYS and demanding that they receive unqualified approval to serve as foster parents. Neither the Does nor their counsel received a reply to the letter.

114. The last correspondence between the parties before initiation of this litigation was exchanged sometime in April, 1999. Rayback reiterated CYS' position and stated that defendants would not change or revoke the Policy.

115. On April 30, 1999, plaintiffs proceeded to file a complaint and motion for preliminary junction against defendants, seeking the court to declare the Policy

4. Paragraphs 92 through 103 are based on the uncontradicted testimony of Joel Hersh, who was accepted as an expert in Public Health Administration. A summary description of the disease is set forth in *Bragdon v. Abbott,* 524 U.S. 624, ——, 118 S.Ct. 2196, 141 L.Ed.2d 540, 554–557 (1998).

unlawful and to mandate that CYS continue with the Does' application approval.

116. On June 22, 1999, a hearing was held on the motion for preliminary injunction.

### III. ANALYSIS

#### 1. Plaintiffs Have Not Shown a Reasonable Probability of Success on the Merits

Plaintiffs contend that they have a reasonable probability of success on the merits because defendants' actions show direct discrimination on the basis of disability and race. Plaintiff's Supporting Brief at 12. We disagree. For the reasons which follow, we find that the evidence at this stage of litigation supports a finding that AJB poses a direct threat to foster children if placed in the Doe home. Therefore, plaintiffs have not demonstrated their likelihood to succeed on the merits in accordance with the first prong for preliminary injunctive relief. Moreover, the court finds plaintiffs' race-based claims unsubstantiated and without merit.

We will first address plaintiffs' race-based claims. We find it noteworthy that defendants have not yet reached their final decision regarding plaintiffs' foster parent application. As such, no foster child has been referred to plaintiffs, nor has any referral been denied to plaintiffs on the basis of race or any basis whatsoever. Moreover, plaintiffs' testimony regarding racial discrimination was rebutted by testimony from Carol Smith and Lisa Rice of CYS. Both defendants denied relating to plaintiffs that CYS would not consider placing a white child in their home.

As there is no evidence that any child was referred to the Does or that the Does were denied any referrals, the court finds plaintiffs' race-based claims of discrimination without merit.

We now turn to plaintiffs' claims under the ADA and the Rehab Act. As previously stated, plaintiffs contend that defendants have violated Title II of the ADA and Section 504 of the Rehab Act. The ADA provides as follows:

(a) No individual shall be discriminated against on the basis of disabilities in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C.A. § 12182.

Section 504 of the Rehab Act provides in pertinent part as follows:

(a) **Promulgation of rules and regulations**

No otherwise qualified individual with a disability in the United States, as defined in section 706(20) of this title, shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a)(footnote omitted).

█ In the instant case, it is undisputed that AJB has a disability. The court will not proceed into a lengthy analysis regarding AJB's disability, since it is conceded by the parties that AJB's AIDS renders him disabled.[5] The question, then, is whether the plaintiffs in this action, AJB's adoptive parents, are entitled to the same protections. 42 U.S.C. § 12112 provides for the definition of "discrimination," which includes "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of

---

**5.** It is apparent based on the medical testimony and evidence presented at the hearing that AJB's AIDS limits "a major life activity," in accordance with the ADA. See 42 U.S.C. § 12102(2). 29 C.F.R. § 36.104(2) defines the phrase "major life activities" as "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." According to Mary Doe and the medical evidence, AJB is unable to care for himself. Therefore, the court finds that AJB's AIDS renders him disabled.

an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). Moreover, according to the regulations promulgated by the Department of Justice:

> "A public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association."

28 C.F.R. § 35.130(g).

Although not briefed or contested in any meaningful way by the parties, the court concludes that plaintiffs are entitled to protection under the ADA and Section 504 of the Rehab Act. According to the interpretive guidelines to 28 C.F.R. § 35.130(g),

> [t]he individuals covered under this paragraph are any individuals who are discriminated against because of their known association with an individual with a disability. For example, it would be a violation of this paragraph for a local government to refuse to allow a theater company to use a school auditorium on the grounds that the company had recently performed for an audience of individuals with HIV disease.
>
> \* \* \* \* \* \*
>
> [I]f a public entity refuses admission to a person with cerebral palsy and his companions, the companions have an independent right of action under the ADA and this section.

28 C.F.R. § 35.130(g) at App., p. 479. Therefore, 42 U.S.C. § 12112(b)(4) was intended to protect otherwise qualified individuals from discrimination because they are known to have an association or relationship with an individual with a known disability. Plaintiffs as the adoptive parents of AJB are such individuals with a close association with a person with a

known disability. Accordingly, plaintiffs are entitled to protection under the ADA and Section 504 of the Rehab Act.[6]

### Direct Threat

■ Since the court determined previously that AJB is a disabled individual under the ADA and Section 504 of the Rehab Act, and that plaintiffs are entitled to protection under the laws as otherwise qualified individuals with a close association with a person with a known disability, we now turn to the exception of direct threat. As explained more fully below, both the ADA and Section 504 of the Rehab Act contain an exception for significant health and safety risks.

The United States Supreme Court in *School Board of Nassau County v. Arline*, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987), introduced the exception to protection under the Rehab Act. This exception has since been incorporated into the ADA and the Rehab Act under 42 U.S.C. § 12182(b)(3) and 29 U.S.C. § 705(20)(D), respectively.

> According to 42 U.S.C. § 12182(b)(3),
>
> [n]othing in this subchapter shall require an entity to permit an individual to participate in or benefit from the goods, services, facilities, privileges, advantages and accommodations of such entity where such individual poses a *direct threat to the health or safety of others.* The term "direct threat" means a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services.

42 U.S.C. § 12182(b)(3) (emphasis added).

Likewise, the exception to the Rehab Act provides as follows:

---

**6.** The court will assume for purposes of ruling on the motion for preliminary injunctive relief, that plaintiffs are "otherwise qualified" to participate in CYS' foster parent program. However, plaintiffs' application has not yet been approved notwithstanding the issue of AJB's AIDS. For example, many of plaintiffs'

background materials such as first aid examinations and criminal and Childline checks need updating, and CYS employees testified at the hearing that John Doe's criminal history and the Does' financial stability have not been given final consideration.

For the purposes of sections 793 and 794 of this title, as such sections relate to employment[7], such term does not include an individual who has a currently contagious disease or infection and who, by reason of such disease or infection, would constitute a *direct threat to the health or safety of other individuals* or who, by reason of the currently contagious disease or infection, is unable to perform the duties of the job.

29 U.S.C. § 705(20)(D) (emphasis added).

The Supreme Court in *Arline* set forth four factors to determine the presence of a "significant risk" to the health or safety of others. These factors are as follows:

[findings of] facts, based on reasonable medical judgments given the state of medical knowledge, about (a) the nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infectious), (c) the severity of the risk (what is the potential harm to third parties) and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm.

*Arline,* 480 U.S. at 288, 107 S.Ct. 1123 (quoting Brief for American Medical Association as Amicus Curiae at 19). Moreover, "[t]he existence, or nonexistence, of a significant risk must be determined from the standpoint of the person who refuses the treatment or accommodation, and the risk assessment must be based on medical or other objective evidence." *Bragdon,* 524 U.S. at ——, 118 S.Ct. 2196, 141 L.Ed.2d at 564 (1998)(citing *Arline,* 480 U.S. at 288, 107 S.Ct. 1123). The finding of a "significant risk" must be "objectively reasonable." *Id.*

We will now examine *seriatim* the four *Arline* factors.

### A. Nature of the Risk

The transmission of the HIV virus has been outlined in the Findings of Fact under Current Medical Understanding of HIV and AIDS. It is undisputed that the HIV virus is transmitted through the exchange of bodily fluids such as blood, semen, and vaginal/cervical secretion. The virus has also been found in minute concentrations in saliva, tears, and urine, although current medical evidence suggests that the HIV virus cannot be transmitted through contact with these fluids. However, the HIV virus has been proven to be transmitted through sexual intercourse (homosexual or heterosexual), intravenous drug use, and transfusion of blood and blood products.

### B. Duration of the Risk

An individual is a carrier of the HIV virus from the point of infection until death. It is undisputed that AIDS is a terminal disease for which there is no cure. Therefore, the risk must be considered present until the carrier succumbs to the disease.

### C. Severity of the Risk

The harm to third parties is life-threatening. However, it is commonly accepted that HIV cannot be transmitted through casual contact. In fact, medical evidence at the hearing suggests that of the 20,000 to 21,000 reported AIDS cases in Pennsylvania, there is no case in which the HIV virus was transmitted through casual contact, such as through the use of a toothbrush or razor. However, the HIV virus is transmitted through the absorption of infected blood or other infected bodily fluids into the bloodstream of a non-infected person. The majority of medically-documented cases of HIV/AIDS transmission stem from sexual contact and the sharing of hypodermic needles.

### D. The Probabilities the Disease Will Be Transmitted

In the instant case, there is a high probability that this fatal disease will be transmitted to children placed in foster care with the Does. Defendants offered evidence at the hearing regarding the characteristics of foster children whom CYS

---

7. Since foster parenting is a gainful activity for which the foster parents are given compensation, the court will deem foster parenting to be "employment" for purposes of the ADA and Rehab Act.

places in foster homes. These characteristics are outlined in the Findings of Facts under Characteristics of Foster Children Placed by CYS. As of March 31, 1999, CYS had 125 children in placement. Of those children:

(a) 49% (61 Children) had behavioral or emotional problems,

(b) 24% (30 children) had been victims only of sexual abuse;

(c) 5% (6 children) were perpetrators only of sexual abuse; and

(d) 7% (9 children) were both victims and perpetrators of sexual abuse.

In addition, defendants testified that children who are placed in foster care may be sexually abused or abused in some manner. These foster children are often aggressive, engage in fighting, are sexually active or sexually assaultive. Furthermore, CYS cannot identify with any certainty at the time of placement which of its foster children will engage in assaultive behavior or those children who will be sexual perpetrators. Those foster children who fit any of these characteristics are at risk of contracting the HIV virus.

### E. Other Factors

In light of the above, it appears that there is evidence from which defendants can make an objective determination of the existence of a direct threat to foster children placed in the Doe home, in accordance with *Bragdon*. Indeed, the medical evidence presented at the hearing compels the conclusion that plaintiffs have not sustained their burden of proving that they will succeed on the merits. Therefore, we find that the evidence thus far indicates that the Policy is objectively reasonable in protecting foster children from the significant risk of harm that exists if placed in a home with an individual with a serious contagious disease. The statistics regarding the characteristics of foster children whom CYS places support such a finding also.

Moreover, the court also considers the mental and physical deficiencies of AJB to have a bearing on this direct threat. In-deed, AJB's communicative skills are limited, and the court questions his ability to communicate the occurrence of inappropriate sexual contact from foster children placed in the Doe home. More significantly, the court questions AJB's ability to fend off inappropriate sexual behavior in the absence of one of his parents.

Plaintiffs argue that there is no direct threat or substantial risk if foster children are placed in the Doe home. Plaintiffs rely on medical evidence concerning the nonexistence of HIV transmission in casual or familial settings. However, the court reiterates the importance of the statistics offered by CYS. The court is unaware of any way of assuring that contact between AJB and a foster child will be indeed casual. Moreover, because CYS cannot at placement always determine if a foster child is at risk of being sexually aggressive or assaultive, there is no reasonable basis to assume that contact between any foster child and AJB will always be in a casual or familial context.

■ However, plaintiffs also contend that defendants are only concerned about potential liability, since placement can be made *after* the biological parents sign their consent. Plaintiffs advance the argument that CYS is neglecting its own statutory mandate of protecting the safety of the foster children since CYS is willing to place children in a "supposed substantial risk" if consent is given by biological parents.

In response to plaintiffs' argument, the court finds that the Policy in question is analogous to the legal concept of informed consent. Physicians, before performing any medical procedure, are required to provide to the patient necessary information about the potential risks to the health and safety of the patient. Once the patient receives the information, he or she can give an informed consent to the medical procedure. The potential risk is still present notwithstanding the patient's informed consent. To this we add that it would still be the physician's professional

responsibility to evaluate the appropriateness of the procedure in light of the patient's needs and physical condition. Along this same vein, it would be the professional responsibility of CYS to determine the appropriateness of the placement, notwithstanding a signed consent and waiver by the biological parent.

Furthermore, in a foster care setting, it is important to remember the overall goal of reunification of the child with his or her biological parent(s). *See* 42 U.S.C. § 671(a)(15)(B)("... reasonable efforts shall be made to preserve and reunify families ...") This court in *Walker v. Johnson,* 891 F.Supp. 1040, 1044 (M.D.Pa. 1995), recognized this goal as well as the temporary nature of foster care. Moreover, as stated by a Pennsylvania court:

> Plainly, foster parents, because they have physical custody of the child, are concerned with the child's day-to-day needs, and therefore they do discharge many parental duties. However, it does not follow from this fact that they thereby assume a status of in loco parentis to the child, distinguished by 'rights and liabilities ... exactly the same as between parent and child.' The reason that foster parents have physical custody of the child is that it would be impractical for the agency to care for the child. The agency, while transferring physical custody [to] the foster parents, remains responsible for the care of the child, and *may at any time* required by the child's interests regain physical custody and terminate the foster parent's relationship to the child.
>
> \*    \*    \*    \*    \*    \*
>
> When foster parents enter into their relationship with the child, *they know that the relationship is temporary [and] that the agency has the authority to remove the child* ...

*In Interest of G.C.,* 449 Pa.Super. 258, 673 A.2d 932, 935–36 (1996) (emphasis in the original)(quoting *In re: Adoption of Crystal D.R.,* 331 Pa.Super. 501, 480 A.2d 1146, 1148–51 (1984)).

Therefore, obtaining the consent of the biological parent before placing a child in a home with an HIV-infected individual only serves to foster this goal of reunification. Moreover, in light of the temporary nature of a foster care placement, it is imperative that biological parents be made aware of any substantial risk or direct threat that their children may face in foster care. Stated succinctly, a biological parent does not lose his or her parental rights unless terminated by a court of law. This concept is reflected in many statutes concerning child welfare. For example, Pennsylvania has adopted a statute that mandates the notification of biological parents upon hospitalization of a voluntarily-placed foster child. 11 Pa.Stat. Ann. § 41 provides as follows:

> **§ 41. Foster child; notification of natural parents upon hospitalization**
> Whenever any child, voluntarily placed under foster care by the natural parent or parents, is admitted to a hospital while under such foster care, it shall be the duty of the placement agency to notify the natural parents or parent of such child of such admission, unless, in the opinion of the placement agency, such disclosure would be detrimental to the mental stability of the natural parent or parents, or child.

11 Pa. Stat. Ann. § 41.

Thus, in light of the goal of reunification, the court cannot find it to be unreasonable or even legally unsound for CYS to require the consent of the biological parent before placing a child in a home with an HIV-infected individual.

In sum, AJB's AIDS status and his overall mental and physical deficiencies, as corroborated by objective, medical evidence, indicate the existence of a direct threat or significant risk of harm if a foster child is placed in the Doe home. Accordingly, the evidence thus far establishes that the Policy is objectively reasonable in accordance with *Bragdon.* Plaintiffs therefore have failed to show a reasonable probability of success on the merits since

AJB falls within the "direct threat exception" to the ADA and Section 504 of the Rehab Act.

### 2. *Plaintiffs Have Not Shown Irreparable Harm*

■ Plaintiffs have failed to show that they will face irreparable harm if the court denies the motion for preliminary injunctive relief. Plaintiffs testified at the hearing that they were approved previously as foster parents by a private foster care agency, Hope For Kids. Moreover, Mary Doe testified that plaintiffs did not accept any foster child referrals from Hope For Kids because the referrals did not meet their needs. It is apparent that other avenues for foster parenting are open to plaintiffs. Therefore, the court finds that plaintiffs have failed to prove irreparable injury.

Moreover, at the time of the hearing, final approval of plaintiffs' foster parent application was pending. CYS has not reached a final decision one way or the other. Because CYS has not rejected plaintiffs' application, the court fails to see the harm claimed by plaintiffs. Even assuming that plaintiffs' application was approved, plaintiffs still cannot prove irreparable injury because CYS never guaranteed placement of a child, a fact which was corroborated by Mary Doe at the hearing. Indeed, it is clear that obtaining the consent and waiver from the biological parent is a threshold condition that the Does must meet before CYS can consider placing a child in their home. It appears that a case by case evaluation must be made in determining which placement is in the best interests of the child; thus, it would be indeed inappropriate and imprudent for CYS to guarantee placement of a foster child without evaluating the foster child's needs in light of the potential foster home's ability to meet those needs.

Lastly, plaintiffs through their various attorneys have made representations to CYS regarding monetary compensation as redress for plaintiffs' embarrassment and humiliation. First, this suggests to the court that money damages alone can atone for the damages claimed by plaintiffs, in contravention to the standard for preliminary injunctive relief. Second, plaintiffs' argument that they have suffered embarrassment and humiliation lacks merit. As previously stated, Mary Doe has a web page which identifies members of her family by their first names, as well as AJB's AIDS status. The court finds that if privacy issues were indeed a concern, it is ingenuous for the Does to use even their first names in the web site and in their e-mail address. Moreover, the hearing was held as a closed proceeding, and the court record is under seal. The court fails to see how plaintiffs have suffered embarrassment and humiliation.

Accordingly, the court finds that plaintiffs have not shown irreparable harm by the denial of preliminary injunctive relief.

### 3. *Balance of the Harm*

■ Plaintiffs contend that neither defendants nor any other third party will suffer harm if plaintiffs are allowed to proceed as foster parents without the consent and waiver policy. We disagree.

We have determined previously that placing a foster child in the same home as AJB constitutes a direct threat of extremely serious to any such child, and we will not repeat our analysis here. *See* Direct Threat, *supra.* Moreover, while plaintiffs at the hearing offered evidence concerning the nonexistent risk of HIV transmission in casual contact settings, this evidence provides little guidance, since 36% of foster children placed by CYS have sexually related issues.

Moreover, the court notes that CYS through its Policy is fulfilling its obligation under federal law. 42 U.S.C. § 671 provides in pertinent part as follows:

**§ 671. State plan for foster care and adoption assistance**

**(a) Requisite features of State plan**

In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which—
(15) provides that—

(A) in determining reasonable efforts to be made with respect to a child, as described in this paragraph, and in making such reasonable efforts, *the child's health and safety shall be the paramount concern;*

(B) except as provided in subparagraph (D), reasonable efforts shall be made to preserve and reunify families—

(i) prior to the placement of a child in foster care, to prevent or eliminate the need for removing the child from the child's home; and

(ii) to make it possible for a child to safely return to the child's home;
. . .

42 U.S.C. § 671(a)(15)(emphasis added). Defendants have a legitimate concern when placing foster children in a potentially risky situation. Indeed, placing foster children in a home with an HIV-infected individual could have grave consequences for defendants and third parties. Aside from compromising CYS' eligibility to receive funding from the federal government, defendants are also subjecting the agency to possible litigation, should an unfortunate situation occur. Moreover, the court cannot ignore the most significant potential harm: the potential harm that a foster child may contract the HIV virus while in care in the Doe home.

Accordingly, in balancing the harm, we find that a significant risk of harm exists to defendants and third parties if the court grants the motion for preliminary injunctive relief.

### 4. Public Interest

Plaintiffs contend that granting preliminary injunctive relief will serve the public interest. We disagree. While there is always a need for foster parents to open their homes to foster children, this need should not diminish the best interests of the child.

Moreover, this court does not dispute the fact that the Does can provide a loving home to a child. However, the court does not believe that the public interest will be served by granting preliminary injunctive relief. As previously stated, the paramount concern for foster care agencies is the health and safety of the children. *See* 42 U.S.C. § 671(a)(15). The waiver and consent Policy appears to further this goal in the best interest of the foster child.

Plaintiffs in their supporting brief contend that discrimination should not be promoted. However, the court finds that the Policy is not a form of unlawful discrimination. Rather, the Policy serves the public interest by protecting sexually deviate children from a contagious, life-threatening disease.

Therefore, the court finds that the public interest will not be served by granting the preliminary injunction.

### CONCLUSION:

Based on the foregoing, we conclude that plaintiffs have not sustained their burden of satisfying the four-prong test for preliminary injunctive relief. We believe that the evidence in this case so far establishes that AJB's AIDS status, in light of his mental and physical deficiencies, as well as the characteristics of foster children placed by CYS, poses a significant risk to children if placed in the Doe home. Moreover, the court finds that plaintiffs have failed to show irreparable harm; that defendants and other third parties may be harmed by the granting of the preliminary injunction; and that the public interest will not be served by the granting of the preliminary injunction. Accordingly, we will deny plaintiffs' motion for preliminary injunctive relief.