

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-5-2001

# Doe v. County of Centre

Precedential or Non-Precedential:

Docket 00-3195

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Doe v. County of Centre" (2001). *2001 Decisions.* Paper 40.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/40

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 5, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-3195

JOHN DOE; MARY DOE,

      Appellants

v.

COUNTY OF CENTRE, PA; CHILDREN & YOUTH
SERVICES OF CENTRE COUNTY; BOARD OF
COMMISSIONERS OF THE COUNTY OF CENTRE; TERRY
WATSON, individually and in his of ficial capacity as the
Director of Centre County Office of Children and Youth
Services; CAROL SMITH, individually and in her of ficial
capacity as the Assistant Director Administrator of the
Centre County Office of Children and Youth Services;
LISA RICE, individually and in her official capacity as a
Foster Home Specialist of the Centre County Of fice of
Children and Youth Services

ON APPEAL FROM THE ORDER OF THE
UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

(D.C. Civ. No: 99-cv-00683)
District Court Judge: The Honorable
James F. McClure, Jr.

Argued on September 27, 2000

Before: MANSMANN, ALITO, and FUENTES, Cir cuit Judges

(Opinion Filed: March 5, 2001)

Mathew M. Gutt (argued)
Carl G. Roberts
Ballard Spahr Andrews &
 Ingersoll, LLP
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania
 19103-7599

 Attorneys for Appellants

Stefan Presser
Scott Burris
American Civil Liberties Union
 of Pennsylvania
125 South 9th Street, Suit 701
Philadelphia, Pennsylvania 19107

 Attorneys for Appellants

Catherine Hanssens
Colleen Sullivan
Lambda Legal Defense and
 Education Fund, Inc.
120 Wall Street, Suite 1500
New York, New York 10005-3904

 Attorneys for American Public
Health Association, AIDS Alliance
for Children, Youth, and Families,
AIDS Law Project of Pennsylvania,
Alliance for Children's Rights,
Lambda Legal Defense and
Education Fund, Inc., The
Juvenile Law Center, Lawyers for
Children, Inc., Legal Aid for
Children/Pittsburgh, The Legal Aid
Society of New York/Juvenile
Rights Division, The National
Alliance of State and Territorial
AIDS Directors, National Center
for Youth Law, The Support Center
for Child Advocates, The Youth
Law Center, and The Association
of Maternal and Child Health

Programs, as Amici Curiae on
behalf of Appellants

Gerard J. Geiger (argued)
Newman, Williams, Mishkin,
 Corveleyn, Wolfe & Fareri, P .C.
721 Monroe Street
Stroudsburg, Pennsylvania 18360

 Attorney for Appellees

Anthony T. McBeth (argued)
Law Offices of Anthony T. McBeth
407 North Front Street, First Floor
Harrisburg, Pennsylvania 17101

 Attorney for The County
Commissioners Association of
Pennsylvania, as Amicus Curiae
on behalf of Appellees

Robert L. Knupp
Knupp, Kodak & Imblum, P.C.
P.O. Box 11848
Harrisburg, Pennsylvania
 17101-1848

 Attorney for The County
Commissioners Association of
Pennsylvania, as Amicus Curiae
on behalf of Appellees

OPINION OF THE COURT

FUENTES, Circuit Judge:

The primary issue raised by this appeal is whether Centre County violated the appellants' civil rights by excluding them from participation in the County's foster care program because their son has HIV and AIDS, and because of their race. This case began when appellants John and Mary Doe, an interracial couple with an HIV – positive son named Adam,1 appr oached Centre County's

_____

1. Names have been changed to preserve confidentiality.

Foster Child Program, seeking to become foster parents. County officials responded by adopting a policy providing that foster families whose members have "serious infectious diseases" may care only for children with the same disease. The policy would permit the Does to car e for uninfected children only if the Does agreed to r elease information regarding their son and the biological par ents executed a written consent releasing the County fr om potential liability. The Does refused to agree to the policy and filed suit, alleging disability discrimination in violation of, among other statutes, Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, and racial discrimination in violation of Title VI of the Civil Rights Act of 1964. The Does sought invalidation of the policy, approval as foster parents, and compensatory and punitive damages. The District Court granted summary judgment to the County on the disability discrimination claims, reasoning that the policy was justified under the ADA's direct threat exception since foster children placed with the Does could sexually assault Adam and contract HIV .

Because we believe that a reasonable fact finder could find that placement of at least some foster childr en in the Does' home would not entail a significant risk of harm, we will reverse. Furthermore, we will r everse the District Court's judgment that none of the Does' racial discrimination claims are ripe for adjudication. However, we will affirm the District Court's decision that the individual County officials are entitled to qualified immunity. We will also affirm the District Court's holding that county government entities are immune fr om punitive damages.

I.

The appellants, John Doe, a 51 year old African-American man, and Mary Doe, a 52 year old Caucasian woman, are married, and live in State College, Centre County, Pennsylvania, with their two adopted sons, Adam, 11 years old, and Steven, 12.

Over the years, Mary has dedicated herself to the care of foster children with special needs. From 1972 to 1989, she cared for 8 foster children and eventually adopted 7 of

them. Adam and Steven, who came to Mary as infants, were the last two children she adopted. Adam came to Mary with HIV and AIDS, which he contracted from his birth mother. Another of Mary's adopted sons was blind, retar ded and had cerebral palsy. Others had been physically and sexually abused. Her efforts have earned her several awards, including Foster Parent of the Y ear by the New York State Foster Parents' Association.

Overcoming a troubled youth and time in prison, John earned a college degree and became active in church and community affairs. He has served as a pr ogram worker in residential group homes for persons with mental retardation and is currently a cab driver. He had no children of his own, but upon marrying Mary, he accepted her children, including Adam, into his home.

AIDS (Acquired Immunodeficiency Syndr ome) is the last stage of progression of the HIV virus (Human Immunodeficiency Virus). HIV infects and destroys specific white blood cells, known as T lymphocytes, that support the body's immune system. As the virus progr esses, infected persons become more and more susceptible to opportunistic infections and diseases, and, although persons with HIV can live for years, the virus has no cure. See generally Bragdon v. Abbott, 524 U.S. 624, 633–37 (1998) (describing the course of HIV and AIDS in detail, with references to medical texts and authorities).

Due to the virus, Adam suffers eating and digestion problems. He receives nourishment thr ough a feeding tube. He has symptoms of autism and permanent lear ning deficits, including difficulties speaking and expressing himself. Unable to care for himself, Adam r elies on his parents and others to assist him with eating, cleaning, and personal hygiene.

Prior to 1996, HIV and AIDS severely thr eatened Adam's health. His eating and digestive problems wer e far more severe, and he weighed only 37 pounds at the age of six in March 1996. At that time, doctors began aggr essive drug therapy that has suppressed Adam's HIV viral load to undetectable levels.[2] Today, despite his physical limitations,

_____

2. Viral load refers to the level of virus in an HIV-positive person's blood.

Adam has good overall health, and suffers no greater risk of opportunistic infection than a child without HIV .

Adam attends school classes for children with special needs. School officials keep his HIV-positive status confidential and do not require disclosure of that status to parents of HIV-negative students. Adam has not transmitted HIV to his brother, Steven, nor to any children with whom he attends school.

The probability of HIV transmission from Adam to others is a crucial issue in this case. During proceedings, the District Court entertained testimony about HIV and AIDS from two medical experts, Joel H. Hersh, an expert in Public Health Administration, and Robert M. Swenson, M.D., a physician and expert in the treatment of infectious diseases. The following discussion proceeds fr om their testimony and related affidavits. See generally Doe v. County of Centre, 60 F. Supp. 2d 417, 419-26 (M.D. Pa. 1999) (summarizing portions of the medical evidence) [hereinafter Doe I]; Doe v. County of Centre, 80 F. Supp. 2d 437, 441-44 (M.D. Pa. 2000) (same) [hereinafter Doe II].

HIV is transmitted only through absorption of infected blood or sexual secretions into the bloodstr eam or mucous membranes of an uninfected person. Bodily fluids such as sweat, tears, or saliva, while containing minute amounts of HIV, pose little to no risk of infection, nor does skin contact with HIV-positive blood, unless the skin is br oken or has open wounds. Thus, the chance of HIV transmission fr om casual contact is virtually nonexistent. Nor mal sibling fighting and roughhousing present negligible risk of transmission. In fact, Dr. Hersh testified that out of the 21,000 AIDS cases in Pennsylvania, there ar e no reported cases of virus transmission due to familial contact or fighting. Even intense physical activities cr eate little risk of infection. For example, Dr. Swenson noted that a study involving football players found that the risk of HIV transmission was one in every 85 million violent contacts.

The two primary modes of infection are thr ough the use of infected hypodermic needles and thr ough unprotected sex. According to Dr. Swenson, the pr obability of HIV transmission through sexual activity varies depending on

6

the activity involved, the specific roles of the infected and uninfected persons in the sexual activity, and the viral load of the infected person. Certain generalities apply. For example, the lower an HIV-positive person's viral load, the lower the transmission risk. In addition, during sexual intercourse, HIV is more easily transmitted from an insertive to a receptive partner than fr om a receptive to an insertive partner.

Relying on his professional experience and the prevailing medical research, Dr. Swenson testified as to the probability of transmission in non-consensual male-to-male sexual activity. These risk findings rely on medical models of disease transmission based on observations of patients, rather than on actual controlled tests. Accor ding to Dr. Swenson, the probability of transmission to a person with HIV who performs oral sex on an infected partner is low, about 1 in 2500 for each occurrence. The pr obability of transmission from a receptive HIV-positive partner to an insertive HIV-negative partner in anal sex is about 1 in 1666. However, the probability of transmission from an insertive HIV-positive partner to a receptive HIV-negative partner under these circumstances is much higher, about 1 in 120.

The appellees in this case are Centre County, the Office of Children and Youth Services of Centr e County ("CYS"), and the Board of Commissioners of Centr e County ("County Board"), as well as individual CYS officials Terry Watson, Carol Smith, and Lisa Rice. We will r efer to the appellees collectively as the "County." Centre County provides a foster care program for children in need of temporary or permanent placements outside the homes of their biological or custodial families. CYS operates the foster car e program and is obligated to follow all applicable federal and Pennsylvania laws. In particular, CYS operates under a statutory duty to investigate foster parent applicants in order to preserve the physical and emotional health of foster children. See, e.g., 23 Pa. Cons. Stat. S 6344(d) (requiring foster programs to investigate prospective foster parents for criminal activity or child abuse). Both Centre County and CYS receive federal funds, and the foster care program receives a portion of these funds.

Terry Watson is the Director of CYS, and oversees the foster care program. Carol Smith is the Assistant Director of CYS, bearing ultimate responsibility and oversight for the training of foster parents. Lisa Rice is a foster home specialist employed by CYS. She helps select and counsel foster families. Tom Groninger, who is not an appellee in this case, is an employee of CYS who perfor ms home studies for prospective foster parents. According to Carol Smith, there are several steps in a foster parent application: (1) an initial phone call; (2) a pr eliminary home study by Groninger; (3) six weeks of pr e-service training for foster parents; (4) a meeting between the foster parents and Lisa Rice, and a final assessment; and (5) a meeting between Rice and Smith to approve or disappr ove the application.

In January 1998, the Does applied to become foster parents under the CYS foster care pr ogram. During the preliminary home study, the Does disclosed to Groninger that Adam had HIV and AIDS. Prior to the Does' application, CYS officials had never knowingly placed a child in a foster home where someone had HIV , and therefore had no policy to address the limitations, if any, applying to such a home. The County claims that CYS, looking for guidance, investigated the policies of other counties throughout Pennsylvania. CYS officials found some infectious disease policies in other counties, but claim that none addressed the specific situation of placing an HIV-negative child in a foster home wher e HIV is present.

Amici curiae, the American Public Health Association and others, challenge the County's claims of investigation, citing numerous policies from other jurisdictions. These policies generally state that family services agencies should neither apply blanket prohibitions against placing HIV –positive foster children with HIV-negative childr en, nor segregate HIV-positive foster children from HIV-negative children without analyzing the particular circumstances of each case. See Dep't of Pub. Welfar e, Commonwealth of Pa., Children, Youth and Families Bulletin: HIV/AIDS Policy 9 (1989) (unofficial draft policy) ("HIV positive children should not be segregated in day care facilities, foster homes, group homes, residential placements, or institutions based on

8

their HIV status alone"); The Dep't of Servs. for Children, Youth and their Families, State of Del., Policy and Procedure Manual: Communicable Diseases S 103 (IV)(F) (1998) ("Except where the presence or risk of[HIV infection from a foster child] presents specialized car e needs, the presence or risk of [HIV] should not be the mitigating factor in the placement decision"); N.J. Div. of Youth and Family Servs., Field Operations Casework Policy and Procedur es Manual S 1502.10 (1999) (when placing HIV-positive foster children, "[s]iblings and children of any age may be placed together in the same household, unless a physician advises otherwise"); Child Welfare League of Am., Meeting the Challenge of HIV Infection in Family Foster Car e 18-22 (1991); Child Welfare League of Am., Serving HIV-Infected Children, Youth, and their Families: A Guide for Residential Group Care Providers 29-33 (1989).

The policies cited are not, however, entirely on point, since they apply to the placement of HIV-positive foster children into foster homes rather than the placement of HIV-negative children into foster homes where HIV is present. Having reviewed these polices, we conclude that only the policy of the Philadelphia Department of Human Services applies to the present situation. That policy declares that "[t]he Department . . . does not discriminate in . . . its recruitment or development of kinship caregivers, foster parents, adoptive parents, and contracted providers on the basis of . . . [their] living or[being] perceived as living with HIV/AIDS." See Children and Youth Div., Phila. Dep't of Human Servs., Policy Manual SS 1010, 5200 (emphasis added).

After its investigation, CYS officials examined the records of Centre County's foster care program. They found a pattern of physical and sexual abuse among foster children:

As of March 31, 1999, CYS had 125 childr en in placement. Of those children:

(a) 49% (61 children) had behavioral or emotional problems,

(b) 24% (30 children) had been victims only of sexual abuse[,]

9

(c) 5% (6 children) were perpetrators only of sexual abuse[,] and

(d) 7% (9 children) were both victims and perpetrators of sexual abuse.

Doe II, 80 F. Supp. 2d at 441 (inter nal quotations and citation omitted). According to CYS officials, a "perpetrator," as used in (c), is a child who has assaulted another child sexually, but CYS's definition of "assault" includes such activities as fondling and disrobing others.

CYS officials further concluded that, given the emergency nature of foster child placement, there was inadequate time to assess each foster child for behavioral or emotional problems prior to placement. While able to identify some sexual perpetrators, CYS officials found that a number of foster children were not identified as sexual perpetrators until after foster placement. Especially disturbing were documented instances of sexual assault by foster children on other children in foster homes.

Motivated by the concern that a foster child might sexually assault Adam , and thereby contract HIV , CYS Director Watson developed the following policy regarding the placement of children when infectious diseases are present:

C) Placement Of Children With Ser ious Infectious Diseases

. . . If a child with a serious infectious disease is placed in a foster home, or if there is a family member of the foster family who has a serious infectious disease, only children with the same serious infectious disease will be considered for placement in that home. The only exception to this policy would be for a parent/guardian of a child in the care and custody of C&YS to sign an informed consent for the placement of their non-infected child in such a home. . . . For this exception to occur, the foster parents would have to voluntarily agree to release information to the child's parents that a member of the foster family has been diagnosed with a specific serious infectious disease.

10

The County Board adopted this policy and dir ected CYS to carry out its terms.3

Meanwhile, Lisa Rice informed the Does that Adam's HIV might present a problem for foster par ent approval. According to plaintiffs' version of events, Rice also alluded to racial considerations, telling Yolanda Lollis of the AIDS Law Project in Pennsylvania,4 as well as Mary Doe, that the HIV issue was irrelevant since CYS did not have any African-American foster children to place with the Does. During later proceedings, Rice explained that CYS uses race as a factor in placing children because it tries to replicate a foster child's original home envir onment. Racial continuity minimizes disruption and change in the child's life. Rice also acknowledged the possibility of racial animosity between the interracial foster par ents and Caucasian biological or custodial parents.

Given the HIV controversy, the Does' application stalled without a formal evaluation of their fitness as foster parents. After delay and mutual recriminations, CYS officials sent the Does a formal letter on December 18, 1998 stating that:

> we are prepared to consider appr oval of you as available foster parents for any HIV-infected child. If you would like to be approved for other childr en, per our policy, you would need to sign a consent allowing CYS to disclose to any child's parents that a member of your family/household is HIV-infected. In turn, the parent must sign an informed consent allowing their child to be placed in your home.

The Does refused to consent to this arrangement.

On April 28, 1999, the Does sued Centre County, CYS, and the County Board, as well as CYS officials Watson, Smith, and Rice, individually and in their official capacities. The Does charged the County with disability discrimination

_____

3. The quoted passage is actually provision IV.C in a policy containing numerous provisions. Nevertheless, for ease we will refer to this provision as the County's policy.

4. Lollis had provided legal advice to the Does in connection with this case.

11

in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. SS 12131-34 [hereinafter"Title II of the ADA"], and Section 504 of the Rehabilitation Act, 29 U.S.C.S 794; racial discrimination in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. S 2000d-1-7; and racial and disability discrimination in violation of the equal protection guarantees under the United States Constitution, pursuant to 42 U.S.C. S 1983. They also filed a motion for injunctive relief. With respect to remedies, the Does sought invalidation of the County's infectious disease policy, their approval as foster parents, and compensatory and punitive damages.

On June 22, 1999, the District Court held a one-day hearing on the Does' preliminary injunction motion. It was during this hearing that nearly all of the r ecord in this case was developed.

On July 12, 1999, the County moved to dismiss the Does' complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim, arguing that: (a) the Policy was valid since Adam's AIDS posed a direct and significant threat to foster children; (b) the Does' racial discrimination claims were unripe; (c) the individual defendants were entitled to qualified immunity; and (d) punitive damages wer e unavailable. Within its motion, the County r eferred to matters outside of the complaint, specifically r elying on evidence from the June 22, 1999 preliminary injunction hearing.

The District Court dealt with the preliminary injunction motion and the 12(b)(6) motion in several related steps. By order dated August 30, 1999, the District Court denied the preliminary injunction motion, finding that the Does failed to prove a reasonable likelihood of success on the merits. Doe I, 60 F. Supp. 2d at 426. By or der dated October 13, 1999, the District Court, believing that the evidence from the hearing sufficed to resolve the case, accepted and considered the County's proffer ed extrinsic evidence. Following Fed. R. Civ. P. 12(b), the Court r easoned that the inclusion of extrinsic evidence mandated the conversion of the motion to dismiss into a motion for summary judgment. See generally Hilfirty v. Shipman, 91 F .3d 573, 578 (3d Cir. 1996) (outlining procedure for conversion). The Court

12

therefore gave the parties 16 days tofile briefs, affidavits, and other materials that might be relevant. The Does objected to conversion, arguing that discovery had been inadequate. They also argued that, in any case, the Court should deny summary judgment on the available r ecord.

On February 1, 2000, the District Court granted summary judgment to the County on all claims. Doe II, 80 F. Supp. 2d 437. It held that Adam's HIV posed a significant risk to foster children who might sexually assault Adam, and that therefore, the dir ect threat exception to the ADA and Rehabilitation Act applied, justifying discrimination via the infectious disease policy. The District Court also held that the individual CYS officials were entitled to qualified immunity because any right the Does had was not clearly established, and, further , that County government entities were immune fr om punitive damages. Lastly, the Court found that the Does' racial discrimination claims were unripe. The Does appealed the order granting summary judgment for the County, [5] and we have jurisdiction under 28 U.S.C. S 1291.

II.

We exercise plenary review over the District Court's grant of summary judgment, Dowling v. City of Philadelphia, 855 F.2d 136, 141 (3d Cir. 1988), and we independently apply the same standard applicable to district courts, Olson v. Gen. Elec. Astrospace, 101 F.3d 947, 951 (3d Cir. 1996) (citations omitted). Federal Rule of Civil Pr ocedure 56(c) directs that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In following this directive, a court must take the facts in the light most favorable to the nonmoving party, the Does, and draw all reasonable infer ences in their favor. McCarthy v. Recordex Serv., Inc., 80 F .3d 842, 847 (3d Cir. 1996).

_____

5. The Does have not contested the denial of their motion for a preliminary injunction.

III.

We first consider the Does' contention that the District Court erred in dismissing their disability discrimination claims brought under Title II of the ADA and Section 504 of the Rehabilitation Act. As a starting point, the protections found in the ADA and in the Rehabilitation Act are interpreted similarly, and, in this case, are identical. See Bragdon, 524 U.S. at 632 (using statutory construction to conclude that the Court should "construe the ADA to grant at least as much protection as pr ovided by the regulations implementing the Rehabilitation Act"). Therefore, except where necessary, we refer only to Title II of the ADA, with the understanding that both statutes are implicated.

Title II of the ADA provides, in pertinent part, that:

> no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, pr ograms, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. S 12132; see also 29 U.S.C.S 794(a) (Section 504 of the Rehabilitation Act) (prohibition on disability discrimination in federal programs). The ADA describes a disability as "a physical or mental impair ment that substantially limits one or more of the major life activities of [an] individual." 42 U.S.C. S 12102(2); see also 29 U.S.C. 705(20)(B) (same under the Rehabilitation Act). Adam's HIV clearly constitutes a disability since it is a physical impairment, 28 C.F.R. S 35.104 (defining "physical impairment"), that substantially limits several of Adam's major life activities, such as talking, walking, and digestion, 28 C.F.R. S 35.104 (defining "major life activities"). See also 45 C.F.R. S 84.3(j) (defining physical impairment and major life activities under the Rehabilitation Act); Bragdon, 524 U.S. at 637, 641 (holding that HIV, even in the so-called asymptomatic phase, is an impairment which substantially limits the major life activity of reproduction).

The protections of the ADA extend to "qualified individuals" who are discriminated against because of their relationship or association with individuals who have a

14

known disability. 28 C.F.R. 35.130(g); compare 42 U.S.C. S 12112(b)(4) (Title I of ADA); H.R. Rep. No. 101-485(III), at 38 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 461 (Title I of ADA) (the ADA "protects persons who associate with persons with disabilities and who are discriminated against because of that association. This may include family, friends, and persons who provide care for persons with disabilities."). As the adoptive parents of Adam, John and Mary Doe have a close relationship entitling them to protection under the ADA.

CYS's policy requires notification of and consent from the biological or custodial parents of HIV-negative foster children when placing those children in homes with HIV-positive individuals. The policy therefor e treats John and Mary Doe differently during the foster parent application process solely on the basis of Adam's HIV and AIDS. As a facial matter, then, the policy constitutes disability discrimination against the Does under the ADA.

Nevertheless, the ADA allows disparate treatment in certain cases. In particular, the ADA r ecognizes that the goal of ending disability discrimination must be balanced against the health and safety risks that disabilities sometimes pose to others. See Bragdon, 524 U.S. at 648-49. Thus, the ADA contains a direct thr eat exception, which allows discrimination if a disability "poses a direct threat to the health or safety of others." 28 C.F.R. Part 35, App. A at 483; compare 42 U.S.C. S 12182(b)(3) (Title III of ADA); see also 29 U.S.C. S 705(20)(D) (Rehabilitation Act). A "direct threat" exists when there is a "significant risk to the health or safety of others that cannot be eliminated by a modification of polices, practices, or procedures or by the provision of auxiliary aids or services." 42 U.S.C. S 12182(b)(3) (emphasis added).6  As the Supreme Court has stated, the exception can only be invoked wher e a risk is significant: "[b]ecause few, if any, activities in life are risk

_____

6. The direct threat exception was a judicially created doctrine first announced in School Board of Nassau County v. Arline, 480 U.S. 273, 287 n.16 (1987). Following that case, Congress amended the disability discrimination statutes to include the Court's dir ect threat language. See
Bragdon, 524 U.S. at 649.

15

free . . . the ADA do[es] not ask whether a risk exists, but whether it is significant." Bragdon, 524 U.S. at 649. Thus, courts and entities deciding whether to exclude the disabled must rely on evidence that "assess[es] the level of risk" for the "question under the statute is one of statistical likelihood." Id. at 652.

To determine the existence of a significant risk, the Supreme Court in School Board of Nassau County v. Arline directed courts to make factual findings concerning the following four factors:

> (a) the nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infectious), (c) the severity of the risk (what is the potential harm to third parties) and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm.

480 U.S. 273, 288 (1987) (internal quotations and citation omitted). These findings must be based on "medical or other objective evidence," with special defer ence to the views of public health authorities. Bragdon, 524 U.S. at 649.

In the leading Supreme Court case, Bragdon v. Abbott, a dentist refused to treat a patient with HIV, believing the patient might infect him. Addressing the dentist's invocation of the ADA's direct threat exception, the Court conducted a rigorous and individualized inquiry into the risk of HIV transmission from patient to dentist. Id. at 650– 54 (scrutinizing the details of studies and other cited authorities). Despite the existence of a theor etically possible means of transmission from patient to dentist, the Court remanded the case to "permit a full exploration of the issue" of risk of transmission given the Court's"analysis of some of the studies cited by the parties." Id. at 655 (dentist argued that he might be infected by HIV –positive patient through airborne blood vapors or thr ough an accidental cut). In doing so, the Court did "not for eclose the possibility that the Court of Appeals [might] reach the same conclusion it did earlier" in holding that ther e was no significant risk to the dentist. Id.; see Abbott v. Bragdon, 163 F.3d 87, 90 (1st Cir. 1998) (finding no significant risk on remand), cert. denied, 526 U.S. 1131 (1999).

16

The disposition in Bragdon follows fr om Congress' intent
that the ADA's prohibitions on disability discrimination
require an individualized determination as to the
significance of risk underlying the direct threat exception,
both by entities evaluating disabilities and by courts
judging the actions of those entities:

> A person with a disability must not be excluded . . .
> based on stereotypes or fear. Nor may a decision be
> based on speculation about the risk or harm to others.
> Decisions are not permitted to be based on
> generalizations about the disability but rather must be
> based on the facts of an individual case. . . The purpose
> of creating the `direct thr eat' standard is to eliminate
> exclusions which are not based on objective evidence
> about the individual involved.

H.R. Rep. No. 101-485(III), at 45 (1990), r eprinted in 1990
U.S.C.C.A.N. 445, 468 (emphasis added); see also Holiday
v. City of Chattanooga, 206 F.3d 637, 643 (6th Cir. 2000)
(holding that a district court erred in accepting a
physician's report about the abilities of an HIV-positive
police officer applicant where "ther e [was] no indication that
the physician conducted the individualized inquiry
mandated by the ADA"); Taylor v. Pathmark Stores, Inc.,
177 F.3d 180, 192-93 (3d Cir. 1999) (employers must make
individualized determinations about the disabilities of
employees); Doe v. Dekalb County Sch. Dist., 145 F.3d
1441, 1446 (11th Cir. 1998) (the Supr eme Court "insist[s]
that district courts undertake `individualized inquiry' in
each case" regarding the significance of risk).

In ruling against the Does' disability discrimination
claims, the District Court accepted the County's ar gument
that Adam's HIV posed a significant risk to foster children
placed in the Does' home. The direct thr eat exception
therefore applied, justifying the County's policy. While
acknowledging that the probability of transmission might
be low during a specific sexual act, the Court stated that it
was "unaware of any way of assuring that contact between
[Adam and a foster child] will be indeed casual," and that
if not casual, there would be a chance that HIV -
transmitting sexual intercourse might take place. Doe II, 80

17

F. Supp. 2d at 443 (internal quotations and citation omitted).

In an effort to follow Arline and Bragdon, the District Court based its significance of risk conclusion on four findings of fact. As to the nature of the risk, it found that "the HIV virus has been proven to be transmitted through sexual intercourse (homosexual or heter osexual), intravenous drug use, and transfusion of blood and blood products." Doe I, 60 F. Supp. 2d at 428. As to the duration of the risk, it found that "AIDS is a ter minal disease for which there is no cure. . . . [T]he risk [is] present until the carrier succumbs to the disease." Id. W ith respect to the severity of the risk, it found that "[t]he harm to third parties is life-threatening." Id. W e agree that there is no genuine dispute regarding these findings.

Most of the tension in this case, however, surrounds the fourth and final factor -- the probability of transmission. As to this factor, the District Court agr eed with the County, and found "a high probability that [HIV] will be transmitted [through sexual contact] to childr en placed in foster care with the Does." Id. at 428. With r espect to this factor, we cannot agree with the District Court because we conclude that there is definitely a genuine dispute of fact. It is obvious from the record that Adam's physical limitations prevent him from being a sexual aggr essor. The District Court must have derived its conclusion regar ding the probability of transmission from the possibility of a sexual misdeed by a foster child, reasoning that: (1) given the data provided by CYS officials, CYS foster childr en have a high propensity to sexually abuse other childr en, see Doe II, 80 F. Supp. 2d at 441; and (2) according to testimony by Carol Smith, "CYS cannot identify with any certainty at the time of placement which of its foster children will engage in assaultive behavior or those children who will be sexual perpetrators," id. at 442 (internal quotations and citation omitted).

We believe that the reasoning the County and the District Court employed is contrary to Congress' intent that analysis of the ADA's direct threat exception should involve an individualized inquiry into the significance of the threat posed. See Bragdon, 524 U.S. at 649. In concluding that

18

CYS foster children have a high propensity for sexual abuse, the District Court relied on a bland and generalized set of statistics, lacking in individual specificity. These statistics reveal that 12% of the foster childr en have had histories of perpetrating some form of "sexual abuse," but the statistics broadly define "sexual abuse" to include activities such as fondling and disrobing that carry no risk of transmitting HIV. Does II, 80 F . Supp. 2d at 441. More important, the statistics do not indicate how many children can be readily identified as being unable or unlikely to engage in high-risk behavior.

The following example illustrates this point. The Does have stated a preference for foster childr en under the age of 12. Foster children of tender age -- i.e., infants and children who have not reached puberty-- are extremely unlikely to commit forcible sexual inter course leading to the transmission of HIV.[7] Mor eover, as noted there is no evidence indicating that Adam is at all likely to commit such an assault, and much evidence suggesting that this is most unlikely. Thus, we believe that the probability of HIV transmission from Adam to a tender-aged child placed in the Does' home appears to be insignificant. Mor eover, contrary to Carol Smith's testimony, such children are precisely the type of children whom CYS can identify as unlikely perpetrators of HIV-transmitting sexual assault.

The County argues that even though the pr obability of

_____

7. We use "tender age" only as helpful terminology for defining a range of sexual development. In doing so, we are not drawing on any legal definition of tender years or age, but rather on the practical physical limits of pre-pubescent children. In fact, we note that the definition of the phrase "children of tender years" has varied in social and legal contexts, with little direct connection to sexual development. See, e.g., Black's Law Dictionary 1480 (7th ed. 1999) (in family law, the tender years doctrine provides "that custody of very young children (usu[ally] five years of age and younger) should generally be awarded to the mother in a divorce unless she is found to be unfit"); Robert G. Marks, Note, Should We Believe the People Who Believe the Children?: The Need for a New Sexual Abuse Tender Years Hearsay Exception Statute, 32 Harv. J. on Legis. 207, 245-46 (1995) (noting that all states limit their tender years statutes to children below a certain age, and arguing that some of the age limits are too low).

transmission is negligible, a generalized policy is justified where a disability, such as HIV, is deadly and has no cure, because the loss of even one life is too great a cost in pursuit of the ADA's honorable goals. Admittedly, when facing the life-threatening consequences of HIV , some federal appellate courts have held that any amount of risk through a "specific and theoretically sound means of transmission" constitutes a significant risk, allowing invocation of the direct threat exception. Onishea v. Hopper, 171 F.3d 1289, 1297–99 (11th Cir. 1999) (allowing segregation of HIV-positive prisoners), cert. denied, 528 U.S. 1114 (2000); see also Estate of Mauro v. Borgess Med. Ctr., 137 F.3d 398, 405, 407 (6th Cir. 1998) (affirming summary judgment against HIV-positive surgical technician even though Centers for Disease Control calculated odds of transmission during a surgery as between 1 in 42,000 and 1 in 420,000); Doe v. Univ. of Md. Med. Sys. Corp., 50 F.3d 1261, 1265–66 (4th Cir. 1995) (affir ming summary judgment against HIV-positive physician wher e the risk of transmission was "minimal but nevertheless ascertainable"); Bradley v. Univ. of T ex. M.D. Anderson Cancer Ctr., 3 F.3d 922, 924 (5th Cir. 1993) (per curiam) (affirming summary judgment in favor of hospital that refused to permit an HIV-positive surgical assistant to assist surgeries, even though risk was "small").

Other appellate courts have endorsed a more exacting standard, requiring some actual risk of transmission including documented cases. See Abbott, 163 F.3d at 90 (finding that plaintiff HIV-positive dental patient produced sufficient evidence that there would be no significant threat to dentist from treatment); Chalk v. United States Dist. Court Cent. Dist. of Cal., 840 F.2d 701, 707–09, 712 (9th Cir. 1988) (directing entry of pr eliminary injunction prohibiting school from transferring teacher with HIV from classroom because uncertain and theoretical possibility of HIV transmission to students did not present significant risk, despite district court's characterization of the potential harm as "catastrophic").

We need not decide the merits of these two positions since, even under the more cautious rule, a r easonable fact finder could find that there is no "specific and theoretically

20

sound means of [HIV] . . . transmission" fr om Adam to a tender-aged foster child. Onishea, 171 F.3d at 1297. In light of the objective medical evidence in the r ecord, a reasonable fact finder could easily find that the risk of a little boy or girl contracting HIV from Adam by forcing him to engage in high-risk behavior is the type of r emote and speculative risk that is insufficient for a finding of significant risk, and insufficient for the invocation of the direct threat exception. See Bragdon , 524 U.S. at 649 (in assessing whether patient with HIV presented a significant risk to dentist, "Arline and the ADA do not ask whether a risk exists, but [rather] whether it is significant"); see also H.R. Rep. No. 101-485(II), at 56 (1990), r eprinted in 1990 U.S.C.C.A.N. 303, 338 (Title I of ADA) (noting that a "speculative or remote risk" is insufficient to support a finding of a "significant risk"), H.R. Rep. No. 101-485(III), at 46 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 469 (Title I of ADA) ("The plaintiff is not requir ed to prove that he or she poses no risk").

Its original sexual assault justification faltering, the County turns to another, contending that physical roughhousing or fighting between Adam and a foster child of tender age could still lead to the transmission of HIV. We reject this contention. Even if we accept the less than obvious proposition that a young child or infant could physically assault Adam, a reasonable factfinder could find, based on the objective medical evidence in the record, that the risk of HIV transmission from casual contact, even intense physical contact, is negligible.

Furthermore, the County's sexual assault and physical violence arguments lose all force in the case of a foster child who is so disabled that he or she is simply incapable of committing sexual or physical assault.8  In such a situation, the County's blanket policy discriminates against the Does because of Adam's HIV positive status even though the probability of HIV transmission, and consequently the risk, is next to zero.

_____

8. We believe there are such handicapped foster children. After all, the record demonstrates that Adam himself was a physically disabled foster child before being adopted by the Does.

21

In sum, the record is insufficient to support the grant of summary judgment in favor of the County, because a reasonable fact finder could not find, based on the summary judgment record, that an individual with HIV would always pose a significant risk to a foster child placed by the County in that individual's home. This generalization fails to address, for example, the placement of tender-aged and disabled foster children. The County ther efore failed to conduct the ADA-mandated individualized deter mination, and the District Court erred in concluding that the ADA's direct threat exception applied.

In addition to its significance of risk ar guments under Arline and Bragdon, the County has pr esented several other justifications for the policy. First, and most persuasively, the County argues that the direct thr eat test in Arline and Bragdon developed in the context of HIV-positive persons rightfully demanding inclusion into the public spher e and into public life. See, e.g., Abbott, 163 F.3d at 90 (holding that HIV-positive dental patient was entitled to dental treatment); Chalk, 840 F.2d at 708-09, 712 (9th Cir. 1988) (holding that school could not transfer teacher with HIV from classroom). The present case, by contrast, involves an HIV-positive family requesting the placement of a non-HIV positive child into their private home. The County argues that this is a novel situation, demanding mor e stringent standards since the threat posed in a private home is much greater.

We have found no authority on this issue. W e acknowledge the intuitive difference between inclusion into the public sphere and placement in a private home. A private home is much more difficult to monitor and involves more intimate contact than would ordinarily take place in the public sphere, such as at a school or within a hospital. Further, as compared to the HIV-positive person seeking inclusion, the HIV-negative child and his or her guardians lack choice in the foster placement process. In addition, entities responsible for foster placement, such as the County, normally have an independent statutory directive to ensure that the placement of children is safe. See, e.g., 23 Pa. Cons. Stat. S 6344. Nevertheless, the differences suggested, while possibly significant in some cases, cannot

22

justify the type of blanket policy implemented her e. Simply put, the distinction between the public spher e and a private home, which relates primarily to monitoring and intimacy, has no material effect on the significance of risk analysis for tender-aged and disabled foster childr en who, by their inherent physical limitations, face negligible risk from an HIV-positive child such as Adam, whether in the public sphere or private home.

Second, the County argues that its policy is analogous to the legal concept of informed consent, which r equires that physicians, before performing any medical procedure, provide patients with information about the potential risks of the procedure to the health and safety of the patient. Doe I, 60 F. Supp. 2d at 429-30 (employing this argument). The analogy is inappropriate here. No pr ovision of the ADA incorporates the concept of informed consent, and we see no basis for engrafting that concept onto the statutory scheme.

Third, the County argues that the particular circumstances of the Does' family situation would compel CYS to deny foster placement anyway, even in the absence of the policy. In particular, the County is concerned with family instability if Adam is hospitalized or has increased needs, an event that might reduce the level of care to a foster child. The problem with this argument is that the County, by virtue of its application of the policy to the Does, never reached this evaluative stage. Mor eover, the record contradicts the County's assertions. Adam's condition is stable. He has good health and faces no greater risk of infection than a child without HIV. T o the extent the County enacts a policy based on the belief that HIV , as a general matter, causes instability, it again controverts the ADA-mandate of individualized determination. The instability argument further rings hollow given that the County does not require disclosure of other stability threatening conditions, such as cancer or neur ological problems.

Finally, the County argues that making accommodations for the Does will be difficult and resour ce-intensive given the realities of foster care. Specifically, the County contends that placements are often made under emer gency time

23

constraints with inadequate time for evaluation. Placing young children with the Does, according to the County, could also be psychologically damaging if those children need to be moved at a later time due to their sexual development. This argument, however, again ignores the principle of individualized evaluation. After all, not every placement will be an emergency, and not every child will need to be moved.

For the reasons stated, we will reverse its grant of summary judgment on the Does' claims of disability discrimination. We emphasize that, while we have used tender-aged and disabled foster childr en to illustrate the shortcomings of the County's policy, our holding does not foreclose the possibility of placing other foster children with the Does, so long as there is no significant risk.

Given our decision, we need not consider the Does' further arguments that the District Court impr operly converted the County's motion to dismiss and that it erred in not deferring summary judgment pursuant to Fed. R. Civ. P. 56(f) until the completion of discovery. See Fed. R. Civ. P. 12(b) (on conversion, "all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56"); Fed. R. Civ. Pro. 56(f); Ford Motor Co. v. Summit Motor Pr ods., Inc., 930 F.2d 277, 284 (3d Cir. 1991).

IV.

With respect to the Does' claims of racial discrimination under Title VI of the Civil Rights Act of 1964 and 42 U.S.C. S 1983, the District Court granted summary judgment to the County. Reasoning that the Does' foster par ent application had not yet been approved and that CYS had not yet denied referral of a foster child to the Does on any grounds, the District Court concluded that the Does' racial discrimination claims were not ripe. See Doe II, 80 F. Supp. 2d at 446. On appeal, the Does argue that the District Court erred. We exercise plenary r eview over whether a cause of action is ripe. Felmeister v. Office of Attorney Ethics, 856 F.2d 529, 535 n.8 (3d Cir . 1988). Upon review, we conclude that the District Court's ripeness determination was incorrect.

24

The ripeness doctrine helps determine whether a dispute or claim has matured to a point warranting judicial intervention. 13A Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure S 3532 (2d ed. 1984). The doctrine exists "to pr event the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect . . . agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Laboratories v. Gardner, 387 U.S. 136, 148–149 (1967), overruled on other grounds, Califano v. Sanders, 430 U.S. 99, 105 (1977). T o evaluate ripeness, we must look at the "fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Id. at 149. "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." Texas v. United States, 523 U.S. 296, 300 (1998) (internal quotations and citation omitted).

Here, the record shows ripe claims. The County enacted the infectious disease policy, and, on December 18, 1998, sent a letter informing the Does that they would not be approved as foster parents without disclosure of Adam's HIV status and without consent of the parents of any prospective foster child. During the application process, CYS officials allegedly made statements that might support an inference of underlying racial motivations-- in particular, Rice allegedly stated that the HIV issue was to some degree irrelevant given the lack of racially suitable foster children.

The District Court erroneously focused on the alleged denial of placement as the Does' sole claim. Besides alleging an improper denial, the Does alleged that the County imposed discriminatory restrictions on the process itself, in part because of racism engendered by the Does' interracial relationship. This allegation, while disputed by the County, does not constitute an "abstract disagreement[ ]" incapable of judicial resolution. See, e.g., Abbott Laboratories, 387 U.S. at 148. Withholding judicial consideration causes an immediate and significant

25

hardship on the Does, who will be deprived of their right to present their federal statutory and constitutional claims for redress. Therefore, we hold that the racial discrimination claims are ripe.9 Accor dingly, we will reverse summary judgment, and remand the case to the District Court for further consideration.

V.

In this action, the Does sued CYS officials W atson, Smith, and Rice in their individual capacities, seeking to impose liability and personal damages. The officials claimed qualified immunity from suit. The District Court agreed, holding that qualified immunity applied because the Does failed to show that the individual officials' conduct violated rights clearly established at the time the conduct occurred. Doe II, 80 F. Supp. 2d at 445. The Does appeal this determination, and we have plenary review. Elder v. Holloway, 510 U.S. 510, 516 (1994). We agree with the District Court.

The doctrine of qualified immunity "hold[s] that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a r easonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The doctrine recognizes "the need to protect officials who are requir ed to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Id.  at 807 (internal quotations and citation omitted).

In determining whether the individual CYS officials are entitled to claim qualified immunity, we engage in a three-part inquiry: (1) whether the plaintiffs alleged a violation of their statutory or constitutional rights; (2) whether the right alleged to have been violated was clearly established in the

_____

9. We express no view as to whether there is sufficient evidence in the summary judgment record to support a claim that the defendants were motivated by racial considerations or that any such considerations had any determinative effect on the proceedings concerning the plaintiffs.

26

existing law at the time of the violation; and (3) whether a reasonable official should have known that the alleged action violated the plaintiffs' rights. Rouse v. Plantier, 182 F.3d 192, 196–97 (3d Cir. 1999). Under the first part of the inquiry, the Does allege a violation of their federal statutory and constitutional rights. The second and thir d parts are related, and involve an inquiry into the "objective legal reasonableness" of an official's action, assessed in light of legal rules that were "clearly established" at the time the officials took the action. Anderson v. Cr eighton, 483 U.S. 635, 639 (1987) (internal quotations and citation omitted). Rights may be clearly established even though the pr ecise conduct at issue has not yet been declared unlawful. See id. at 640. Throughout the inquiry, the officials' subjective intent is irrelevant. See id. at 639.

The Supreme Court has directed that the right in question should be defined in a particularized and relevant manner, rather than abstractly. See id. at 640. Therefore, we define the right in question as the right of HIV–positive individuals and related persons to be fr ee from generalized discrimination when public agencies place HIV –negative individuals into their HIV–positive private homes. To defeat qualified immunity, this right must have been sufficiently clear such that a reasonable official would have known that enacting and applying the County's policy would have violated the right. See id. at 640.

To the contrary, however, the placement of HIV–negative children into HIV–positive private homes presents a novel legal issue. As we noted earlier, federal cases involving HIV and disability discrimination nearly universally deal with access to the public sphere, rather than placement into private contexts, such as homes or residences. Of the Pennsylvania county policies we have reviewed in this case, only one directly applies to the right in question, and then only in general terms. Children and Y outh Div., Phila. Dep't of Human Servs., Policy Manual SS 1010, 5200.

In addition to the novelty of the issue, CYS officials had a separate legal duty to protect the health of foster children. See, e.g., 23 Pa. Cons. Stat.S 6344. As a legal matter, the interplay between this duty and the ADA's prohibition of generalized determinations under the direct

27

threat exception was unclear when the policy was drafted. This is especially true given that there exists authority supporting the proposition that HIV-positive individuals may be segregated from HIV-negative individuals under the direct threat exception even where the possibility of transmission is low. See, e.g., Onishea , 171 F.3d 1289 (segregation of HIV-positive prisoners in the prison context); Estate of Mauro, 137 F.3d 398 (limiting activities of HIV-positive surgical technician); Univ. of Md. Med. Sys. Corp., 50 F.3d 1261 (limiting activities of an HIV -positive physician); Bradley, 3 F.3d 922 (limiting activities of a HIV-positive surgical assistant). For these r easons, we conclude that the right in question was not clearly established such that a reasonable official would have known that the policy violated the ADA, and we will therefore affirm the District Court's holding that the CYS officials had qualified immunity from suit.

VI.

The Does' final argument on appeal is that the District Court erred in holding that the County gover nment entities -- Centre County, CYS, and the County Boar d -- are immune from punitive damages in suits under T itle II of the ADA and Section 504 of the Rehabilitation Act.10 We exercise plenary review over this legal issue.

The Does seek punitive damages from the County government entities under Title II of the ADA, Section 504 of the Rehabilitation Act, and 42 U.S.C. S 1983. As to S 1983, City of Newport v. Fact Concerts, Inc., stands for the proposition that municipalities, and mor e broadly, state and local governments entities, are immune from punitive damages under that statute. 453 U.S. 247, 271 (1981). The issue presented here is whether the District Court correctly extended the holding of City of Newport, to suits brought under Title II of the ADA and Section 504 of the Rehabilitation Act.

_____

10. In order to address the Does' ar guments, we must depart from previous practice in this opinion and r efer separately to Title II of the ADA and Section 504 of the Rehabilitation Act.

28

We have not found any federal appellate court opinions that have addressed this issue. The district courts that have addressed it are divided, some holding that punitive damages are available against municipalities under Title II and Section 504, and some holding that they ar e not. Compare, e.g., Dadian v. Village of Wilmette, No. 98-C-3731, 1999 U.S. Dist. LEXIS 6846, at *9-10 (N.D. Ill. May 4, 1999) (punitive damages available); Purcell v. Pennsylvania Dep't of Corr., No. 95-6720, 1998 U.S. Dist. LEXIS 105, at *34-39 (E.D. Pa. Jan. 9, 1998) (same); DeLeo v. City of Stamford, 919 F. Supp. 70, 74 (D. Conn. 1995) (same); Penney v. Town of Middleton, 888 F . Supp. 332, 342 (D.N.H. 1994) (refusing to dismiss S 504 punitive damages claim but not definitively deciding the issue); with Adelman v. Dunmire, No. 95-4039, 1996 WL 107853, at *4 (E.D. Pa. Mar. 12, 1996) (punitive damages unavailable).

Our analysis begins with City of Newport. In holding that a municipality is immune from punitive damages under 42 U.S.C. S 1983, the Supreme Court r easoned that, at the time Congress enacted the statute that is nowS 1983, it was generally understood in common law that a municipality "was to be treated as a natural person subject to suit for a wide range of tortious activity, but this understanding did not extend to the award of punitive or exemplary damages." City of Newport, 453 U.S. at 259-60 (footnote omitted). The common law rule developed fr om a reluctance to punish innocent taxpayers and bankrupt local governments because of the actions of a few miscreant public officials. Id. at 266. ReviewingS 1983, the Court found no indications, in the common law or legislative history, that Congress intended to abolish the doctrine of municipal immunity from punitive damages. Id. at 259-66.

The Supreme Court also looked to public policy. It reasoned that the rationales underlying punitive damages did not support exposing a municipality to such damages for the bad faith actions of its officials. First, since municipal officials, rather than municipalities, were the wrongdoers, sanctioning municipalities would not advance the retributive purpose of S 1983. Id. at 267-68. Second, the Court believed that it was unlikely that municipal officials would be deterred from wr ongdoing by large

29

punitive damages awarded against municipalities. And, in any case, a more effective deterr ent existed in the possibility of awarding punitive damages dir ectly against officials and their personal finances. Id. at 269-70. Furthermore, the Supreme Court noted the high costs of expanded damages remedies under federal statutory and constitutional law, costs that might threaten the financial integrity of local governments. Id. at 270. Since City of Newport, the principle that municipalities ar e immune to punitive damages under S 1983 has been extended to other government entities. See, e.g., Bolden v. Southeastern Pa. Transp. Auth., 953 F.2d 807, 830 (3d Cir. 1991) (extending the rule to regional authorities).

The principles derived from City of Newport are directly applicable to the present case. When Congr ess enacted Title II of the ADA and Section 504 of the Rehabilitation Act, it knew of the common law rule precluding punitive damages against municipalities. Therefore, under the City of Newport framework, the question is whether Congress intended to disturb that settled common-law immunity.

To be sure, an opposing principle exists. Namely, the Supreme Court in Franklin v. Gwinnett County Public Schools directed courts to "presume the availability of all appropriate remedies [for a federal right of action] unless Congress has expressly indicated otherwise." 503 U.S. 60, 66 (1992). For example, relying on the Franklin presumption of remedies and the lack of congressional expression to the contrary, the Fourth Cir cuit held in Pandazides v. Virginia Board of Education, an employment case in which the sole defendant was a state boar d of education, that the plaintiff could seek punitive damages under Section 504. 13 F.3d 823, 830-32 (4th Cir. 1994) (full panoply of legal remedies available, including punitive damages in suit against employer); see also Pur cell, 1998 U.S. Dist. LEXIS 105, at *34-39 (following similar reasoning); cf. Schultz v. Young Men's Christian Ass'n of the United States, 139 F.3d 286, 291 (1st Cir. 1998) (suggesting that, in a suit under Section 504, "damages for emotional distress [might] be justified to punish patent misbehavior or the deliberate infliction of humiliation"); but see Moreno v. Consol. Rail Corp., 99 F.3d 782, 790-92 (6th Cir. 1996) (en

30

banc) (holding that, based on the lack of congressional intent to override existing punitive damage norms, Section 504 does not allow punitive damages).

We believe, however, that the analysis underlying Franklin, and employed in Pandazides, does not control in this case. The Franklin presumption is rooted in the common law principle, recognized by the Supr eme Court as early as Marbury v. Madison, that a right without a remedy is not a right at all. See 503 U.S. at 66-67 (citing numerous authorities). Prior to Franklin, some courts had held that monetary damages were unavailable in suits br ought under Title IX of the Education Amendments of 1972. See 503 U.S. at 64-65. The Franklin Court settled this dispute, holding that monetary damages were available. In the present case, the principle of Franklin has limited applicability since, irrespective of the availability of punitive damages against municipalities, several other monetary remedies are available to enforce the rights in Title II and Section 504. Limiting punitive damages will not r ender those rights meaningless. Moreover, insofar as the rules of Franklin and City of Newport conflict, the reasonable way to reconcile them is to give effect to the narrower rule in the latter. Cf. Morales v. Trans W orld Airlines, Inc., 504 U.S. 374, 384 (1992) (in statutory construction, "the specific governs the general"). After all, the issue here is not the general availability of damage remedies, but rather the specific availability of punitive damages against municipalities. In these circumstances, City of Newport tells us to assume that Congress intended to r etain common law immunity, unless there is a clear expression of congressional intent to the contrary. See 453 U.S. at 263-64.

Title II and Section 504 incorporate by r eference the enforcement scheme found in Title VI of the Civil Rights Act of 1964. See 42 U.S.C. S 12133 (T itle II incorporates enforcement scheme in Section 505 of the Rehabilitation Act); 29 U.S.C. S 794a(a)(2) (Section 504 and 505 of the Rehabilitation Act adopt the remedies available under Title VI of the Civil Rights Act of 1964). Therefor e, we may look for congressional intent in Title II and Section 504, as well as in Title VI. On their face, however , neither Title II nor

31

Section 504 indicate a congressional intent to override municipal immunity to punitive damages. Likewise, support for the availability of punitive damages against municipalities cannot come from Title VI since the general view is that punitive damages are not available, in any form, under that statute. Moreno , 99 F.3d at 790 (citing numerous cases).

Nevertheless, the Does argue that the Rehabilitation Act Amendments of 1986, Pub. L. No. 99-506, 100 Stat. 1807 (1986), demonstrate Congress' intent to eliminate municipal immunity from punitive damages in suits under T itle II and Section 504. Title X, section 1003, of the Rehabilitation Act Amendments of 1986, entitled "Civil Rights Remedies Equalization," abrogates the states' Eleventh Amendment immunity from, among other things, suits under Section 504 of the Rehabilitation Act and Title VI of the Civil Rights Act of 1964. See 42 U.S.C. S 2000d-7. In particular, the Civil Rights Remedies Equalization provision states that, "[i]n a suit against a State for a violation of [these statutes] . . . remedies (including remedies both at law and in equity) are available . . . to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State." 42 U.S.C.S 2000d-7(a)(2). The Does construe the Equalization pr ovision as a broad grant of remedies, evidencing Congr ess' intent that punitive damages should be available against municipalities. We disagree with the Does' interpretation. The provision only states that the remedies available against a state government would be the same as those already available against an entity other than a state. It says nothing more about punitive damages.

Another argument suggested by the Does hinges on the Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (1991). That act expressly amended T itle I of the ADA (employment discrimination) to allow awards of punitive damages against individuals and private entities, but not against municipalities and government entities. 42 U.S.C. S 1981a(b)(1). The act did not amend T itle II. One district court has reasoned that the amendment of T itle I, without change to Title II, shows that Congress intended not only to prohibit punitive damages against municipalities in the

32

employment context under Title I, but also to allow punitive damages against municipalities under Title II. See generally Purcell, 1998 U.S. Dist. LEXIS 105, at *34-39. We decline to draw such a broad inference of congressional intent, especially where numerous explanations for the lack of amendment to Title II are possible. Compare, e.g., id. at *36-38 (lack of amendment to Title II indicates availability of punitive damages); with Harrelson v. Elmore County, 859 F. Supp. 1465, 1468-69 (M.D. Ala. 1994) (lack of amendment to Title II "counsels against a statutory construction that punitive damages are available").

In summary, we find that Title II of the ADA and Section 504 of the Rehabilitation Act lack any indicia of Congress' intent to override the settled common law immunity of municipalities from punitive damages. In addition, just as in the S 1983 context, notions of retribution and deterrence provide weak support for awarding punitive damages against dispassionate municipal government entities, rather than offending officials. See City of Newport, 453 U.S. at 267-70. Awarding such damages also threatens the financial integrity of local governments. Id. at 270. Given these considerations, we believe that City of Newport should apply with equal force to suits under Title II of the ADA and under Section 504 of the Rehabilitation Act. Consequently, the Does may not recover punitive damages from the County government entities.

VII.

For all these reasons, we will reverse the District Court's grant of summary judgment against the Does on their claims of disability discrimination and remand for further discovery and factual findings. We will also reverse the District Court's grant of summary judgment in favor of the County on the Does' racial discrimination claims and remand for further proceedings. Lastly, we will affirm the District Court's conclusions that the CYS officials are entitled to qualified immunity and that punitive damages are unavailable against the County entities.

33

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit